## COURT OF APPEALS, NOVEMBER TERM, 1797.

### CHAPLINE et al. vs. SCOTT.

APPEAL from a *decree* of the *Court* of *Chancery* passed in favour of the complainant, (the present appellee) for the specific performance of a contract for the sale of part of a tract of land called "*The Resurvey on Content*," lying in Washington county.

As the case appears to be sufficiently stated in the arguments of the counsel concerned on the appeal, in the court of appeals, the Reporters have omitted to give any other statement.

HANSON, chancellor, (May term 1794) gave his opinion, that the court of chancery might compel the defendants to perform the contract stated in the bill, considering the price to be paid for the land to be intended to be paid or discounted in specie; that as nothing appeared in the cause to warrant the laying down the lands, otherwise than by course and distance, the quantity of the land should be considered to be such as was ascertained by the complainant's location; that the land ought to be conveyed to the complainant agreeably to the said location, on the complainant's paying the balance, (if any there should appear to be after crediting him with the sums due to him as executor of *George Scott*, and with the payments on account of the land by him made at their actual value,) or upon its appearing that no balance was due; and that an account should be taken between the parties to shew whether or not any balance was due. He accordingly adjudged, &c. that the complainant and defendants account with each other; that the defendants be charged with all sums due from them, as executors of *Joseph Chapline*, to the complainant, as executor of *George Scott*, or by him paid on account of the said contract; that all payments made in continental money be charged according to their value in specie; that the complainant be charged on the 6th day of February 1779, with the sum of 403*l*. 10*s*. as the price of 269 acres of land then sold to him; that in stating the said account interest be charged agreeably to the principles of this court established; that is to say, that whenever a sum was to be credited, more than the interest at that time due, a balance was to be struck; and that the auditor of this court audit and state the said account,

Nov: 1797.

Chapline
vs.
Scott.

and return the same to this court, subject to the exceptions of either party, and to be done with as to the chancellor should seem just and reasonable.

The auditor having reported and stated an account, by which it appeared that there was due from the complainant to the defendants, as executors of *Joseph Chapline,* on the 24th June 1794, including interest to that day, for the balance of the purchase money, the sum of 448*l.* 6*s.* current money, THE CHANCELLOR on the 1st of November 1794, passed an order that the auditor's report, and the account by him stated, should be approved and confirmed, unless cause to the contrary be shewn on or before the 4th day of February term then next, provided a copy of the said order was served on the complainant any time within twenty days from the date thereof.

AFTERWARDS, on the 21st of May 1795, THE CHANCELLOR passed the following order, to wit:

" THE CHANCELLOR, on the first examination of this cause was of opinion, that as the complainant stated the contract to have been for the purchase of land partly in paper money, which greatly depreciated between the date of the contract and the times of payment, this court was restrained by principles, established by former decisions, from interfering to enforce the contract, supposing it to have been as thus stated by the complainant; but as the defendants insisted that the contract was on their part entirely for specie, or the value thereof, and was willing to perform it, the chancellor conceived that the complainant might (if he thought proper) take a conveyance, on discharging the balance, (if any there should appear to be on stating the account) supposing the contract to have been as alleged by the defendants. It was for this reason that the auditor was directed to state an account as he has returned it.

THE CHANCELLOR *has of his own accord* reviewed the papers; and this cause appears to him materially different from the causes before alluded to, which were instituted to enforce contracts wholly for paper, or for current money, whilst paper was tenderable at par. The court considered these contracts as speculative bargains, calculated to gain one party an advantage not contemplated by the other; and as it unquestionably has a discretion on the circumstances of each case, in which application is made for enforcing a contract, either to grant its aid, or to refer the complainant to his remedy at law, the defendants in the causes aforesaid were either dismissed, or were only obliged to make restitution.

In the present case one manifest object of both parties was the discharge of *bona fide* debts, long before contracted. The recovery of those debts may be precarious

in case the complainant does not choose to take a conveyance on the terms before mentioned, or in case the court should dismiss the bill, or if the complainant shall choose to take a conveyance on those terms, the value of those debts may eventually be lost.

It is indeed difficult to decide from the declarations of witnesses what the contract really was, or what was the value of the land at the time of the contract. One thing, however, is certain, that at the time of the contract the law prohibited all distinctions between specie and paper; and every bargain for current money, without an express stipulation for gold and silver, or to prevent the payment of paper, was universally considered as a contract for paper.

The chancellor then conceives, from the whole of the testimony, the true meaning of the parties must have been, that all fair subsisting claims of the complainant should be discounted from the price of the land at par, and that the balance might be paid in current money of whatever kind. Supposing the contract to have been thus, this court cannot enforce it exactly as it was; that is to say, this court proceeding on principles of equity and good conscience, will not direct payments, or advances in paper, made *after* the date of the contract, when a considerable depreciation had taken place, to be discounted at par, from the price of the land, and oblige the party to convey on receiving the balance. If it were not for the old subsisting specie debts, this court, to be uniform in its decisions, would refuse to interfere, and would refer the complainant to his remedy in a court of law.

It is on account of these debts that the chancellor considers the contract not altogether as a speculating bargain, or a kind of wager relative to the rise or fall of paper. Taking into consideration the amount of those debts, as stated by the auditor, and the value of the land, on striking an average price from the various values mentioned in the depositions, it appears to him that such a contract could not be deemed otherwise than fair and conscientious, provided the balance, after discounting those debts, had actually been paid in paper at the time of the contract; as the precise quantity of land was not then known, that balance could not be ascertained, and therefore was not paid.

It now remains for the chancellor to determine what shall be done, under all the circumstances of the case; and, after long and anxious deliberation, he thinks the following mode of stating the account the only way of stating it for the purpose of laying the foundation for a final decree, which shall be consistent with the ends of

Nov. 1797.

Chapline
vs
Scott

justice, and not repugnant to the established principles which have influenced the decisions of this court, and of the chancellor in England, relative to the specific performance of agreements. *The first receipt, (6th February, 1799) which recites the contract, expressly says, that the defendant has received so many pounds, &c. in discharge of the contract.* Had it been sufficient, with the old debts, to stand against the price of the land, the complainant would have fully performed his agreement. As to subsequent payments in paper, the only doubt that can arise, is whether their value shall be compared to specie, or to the value of paper at the time of the contract. As the chancellor must either model the contract, to decree according to justice, or dismiss the bill, he thinks it proper that the value of those payments be compared to the value of specie; and by so doing he conceives that he places matters in such a situation, as that neither party can reasonably complain.

It is adjudged and ordered, that the auditor of this court again, from the papers in this cause, state an account between the parties, charging the complainant with the price of the lands at thirty shillings per acre, and with all just claims against him, giving him credit for all just claims, and for the payment made at the time of the contract, at par; charging the balance, giving credit for subsequent payments in paper according to their actual value compared *to specie;* charging interest according to the principles in this court established, that is, striking a balance whenever a credit is to be given superior to the interest at the time due, and stating the balance due after the last payment; and that having so done, he make a report, subject to be done with as to the chancellor shall seem just."

THE AUDITOR having stated an account pursuant to the last order, and reported a balance due from the complainant to the defendants the sum of 90*l.* 15*s.* 5*d.* including interest to the 23d of May 1795, the CHANCELLOR thereupon, on the 10th of October 1795, passed his final decree, approving of the report of the auditor, and decreeing, that upon the payment of the said balance by the said complainant to the defendants, with interest, &c. the said defendants by a good deed, &c. should give, grant, &c. unto the complainant, and his heirs, all that part of a tract of land in Washington county called "Contentment," or "The Resurvey on Content," or "Contentment Resurveyed," beginning at, &c. containing 269 acres, &c. &c.

*Cooke, Pinkney* and *Mason,* for the complainant.
*Duvall, Key* and *Shaaff,* for the defendants.
The defendants appealed to the court of appeals.

*Key* for the appellants. The appellee states in his bill, that *Joseph Chapline*, the father of the appellants, was indebted to *George Scott*, the father of the appellee, and by his will devised his lands to be sold at the discretion of his executors, the present appellants. That *Joseph Chapline*, one of the executors, on the 6th of February 1779, sold to the appellee part of a tract of land called *The Resurvey on Content*, part of the land so devised to be sold by the will, supposed to contain 200 acres, with certain courses and distances, &c. at and for the sum of thirty shillings continental money, per acre; and on that day he paid him 206*l.* 12*s.* 6*d.* continental money, in part discharge, and took a receipt; that he afterwards paid certain sums in continental money, in part payment of the land, viz. 30*l.* on the 19th April 1779, and 101*l.* 5*s.* on the 30th of April 1779. That the executors of *Joseph Chapline* were indebted to him, as executor of *George Scott*, in sundry sums of specie, viz. &c. and offered to deduct the balance of the purchase money from these sums. That in December 1787, the land was surveyed, and it held out 260 acres, and supposing the executors were then indebted, he caused a deed to be prepared in June 1788, and tendered to be executed, but which was refused. PRAYS a specific performance, &c. The agreement, receipts, &c. are exhibited.

I consider none of the answers material but *Joseph Chapline's*, who admits the sale, but swears it was for thirty shillings specie. He sets forth a letter from the appellee, who offered fifty shillings, if it was the land *Conrad Ringer* had shewn him; afterwards *Scott*, alleging the price too high, the bargain was closed at thirty shillings.

On the coming in of the commissions and testimony, the chancellor decreed in conformity with the established rules of his court, that all payments in continental money must be reduced to specie before he would decree a specific conveyance, and directed the auditor so to state an account. The auditor did so state an account. The counsel for *Scott took no exceptions* to the report of the auditor, or principles of the account. This I take for granted, because none appear on record; and because the chancellor states, *that of his own accord* he reviewed the papers, and gave new instructions to the auditor to state an account on different principles.

On the first audit a balance was made due to the appellants of 448*l.* 6*s.* 0*d.* current money.

On the second audit, only the sum of 90*l.* 15*s.* 5*d.* is stated to be due. And it is important to examine which of the statements is founded on correct principles.

Nov. 1797.

Chapline
vs.
Scott.

There is no *positive* evidence in the cause as to the species of money (whether paper or specie,) the land was sold for. The appellee in his bill, states it was for thirty shillings continental paper money. The appellant, *Joseph Chapline,* who solely made the contract, swears it was for thirty shillings specie per acre; and the circumstances attending the transaction irresistibly prove it. In February 1779, when the contract took place, depreciation was universally known and felt, it was 10 for 1; thirty shillings per acre would only be worth three shillings specie, a sum that would not pay the caution and expense of taking it up and procuring a patent for it. Examine the auditor's statement, and it will be found that *Chapline,* as executor of his father, owed *Scott,* at the time of the contract, 143*l.* 12*s.* 9*d.* specie—at thirty shillings per acre, and depreciation 10 for 1, would not *Scott* have paid off the whole in paper money, and kept his specie debt against the estate? Unquestionably! His specie debt was worth more than 1430*l.* of continental money, a sum more than double what he was to pay for the land.

To suppose the contract then at thirty shillings continental money, is to suppose *Chapline* was selling at three shillings specie per acre, and what is still more absurd, is to suppose *Scott* was giving a debt, worth more than twice the amount of the purchase in continental money, and paying *Chapline* money to boot. This is refining (for there is no proof) almost to folly; while to me the contract appears plain, and reconciles their conduct to common sense. *Scott* wished to *secure his specie debt, and to do it, he bought the land*—the debt was to be set off against so much of the purchase money at thirty shillings per acre, and *Scott* was to pay the balance at the same rate—there can be no doubt.

The uniform current of decisions has been not to decree a specific performance, until continental payments are reduced to their value. This is acknowledged by the chancellor; but he endeavours to distinguish *this case* in his second directions to the auditor.

Let us examine the grounds of his distinction—The chancellor observes, from the testimony, it is difficult to ascertain the value of the land, or what the contract was, but *that the manifest object of both parties was the discharge of bona fide debts.* I admit it, and to the extent of those debts, so much was paid the moment the contract was closed. But let me ask, was the 206*l.* 12*s.* 6*d.* continental money, paid on the day of the purchase, *one of the bona fide debts in contemplation of the parties?* I say no, it was a part payment of the balance due after deducting the debts, and must be reduced to the value of the debts.

viz. specie, as much so as any one of the subsequent payments.

The chancellor next observes, "the law prohibited all distinctions between specie and paper." This is admitted; but a new principle is introduced when a person applies to a court of equity for aid, that is, you must do equity to entitle yourself to equity, or chancery will refuse to aid you; they will not decree a specific performance until complete equity is done—and therefore this court *does make distinctions* between a payment in specie, and a payment in continental money, and this has been decided in a multitude of cases.

The chancellor has observed, that it is on account of the *bona fide* debts that he does not consider the bargain as a speculation or wager; and if this be so, which I admit, does it not show the intent of the parties that those specie debts were to go *at par* in discharge of so much of the purchase money? And if so, do they not by this very act, determine the value of the money for which the land was sold? Where is the evidence, or where the principle in this contract, which says, to the amount of the specie debts, the contract or money shall be considered as specie, but for the balance it shall be continental, that is at 10 for 1? I can discover nothing like a contract of this nature, nor no principle of equity operating to introduce such a one. I conceive the chancellor has been led into this mistake from an erroneous impression or understanding of the first receipt, which recites the contract; for he says, in his second decree or directions to the auditor, "that the first receipt expressly says that the defendant has received so many pounds, in discharge *of the contract.*" Had this been the fact, it would have been strong evidence that the sale was for continental money. But the fact is not so, the receipt does not say *in discharge of the contract*; it only says *in part payment of a* tract of land, &c. I beg the court to look at it; and a more obvious distinction cannot exist, than a receipt in discharge of a contract, and a receipt in part payment of a tract of land, &c.

But had the receipt said in discharge of the contract, it would not have operated. I refer the court to the case of *Craufurd vs. Croxalls* in the court of chancery, where the defendants' father sold land, and gave bond for conveyance of it; the complainant gave bond for the purchase money, afterwards paid continental money, and took in his bond with a receipt in full on it, filed the bond in court, and filed the defendant's letter, saying he was ready to convey the land to him. The defendant died; bill was filed under these special circumstances for a spe-

cific conveyance, and the court refused it until the payments in continental money were made good.

I believe it is the strongest case on record, and infinitely stronger than the present in all its circumstances.

I humbly contend, the chancellor's second directions to the auditor, on which audit his final decree took place, was wrong, and ought to be reversed; and I verily believe he was led into the mistake by misconceiving the receipt, which the court will perceive *influenced his* instructions, and which he has mistated, or rather incorrectly stated. And I trust this court will see the propriety of adhering to his first instructions, and to the first audit, and that they will confirm that audit in our favour for the sum of 448*l.* 6*s.* 0*d,* &c. and so give consistency to all decisions on the subject.

Another circumstance my client considers himself aggrieved in—I admit costs are discretionary; but take either audit, the appellee owes the appellants money. He calls for a specific performance of a contract, which on his part is not complied with—against executors too, who were not bound to convey until he did comply on his part. What colour of equity exists to burthen our estate with half the costs under such circumstances—we hope the costs, which accrued in the court of chancery, will be decreed against him.

The chancellor's idea of the contract, and his decree, introduces a singular novelty. He directs the *debts* to be discounted out of the purchase money—so far correct. He next directs the payment of 206*l.* 12*s.* 0*d,* on the day of the contract, to be stated at par—and then directs the subsequent payments to be liquidated at specie value. Surely if the contract was for *paper money in 1779,* the subsequent payments ought only to be reduced to the *value* at *the time of the contract.* Why are the latter payments to be reduced to specie, and not the first? The difficulties at once disappear, and the contract is consonant to reason and the sense of the parties, when the debts are set off for so much of the purchase money, and the paper money payments are all reduced to the value of what was first paid, viz. specie; for to discount a specie debt, and to pay specie, is synonimous in law and equity, and by so doing they themselves fixed the value of what was to be paid.

*Cooke* for the appellee. The contract upon which this bill was filed, was made in February 1779. It does not mention specie, and it is to be observed, that continental money was then the *only money* in circulation, and there was not as much specie in the state as would have paid for the land, had the contract been, as the appellants contend it was, to be discharged in specie.

At that period also, the court will recollect, paper money was the current money of the state, and a legal tender in payment of all contracts. Can it be imagined if the case rested upon this point alone, without any testimony, that the parties would contract for any other money than such as was in circulation, and which might be had to complete the contract.

But *Charles Beatty*, the only evidence who was present, says specie was never mentioned; that *Chapline* told him he sold the land to pay the debts he owed to *Scott;* and that he understood *Scott* was to discount those debts, and to pay the residue in paper money. It is inferred from hence, by the counsel for the appellants, that as part was to be discounted, which was owing in specie, that the whole contract must have been for specie also. But this conclusion by no means follows. *Chapline* owed *Scott* 143*l*. 12*s*. 9*d*. in specie, and interest, but he might have paid him at any moment in continental money, and *Scott* knew it. What would it have availed *Scott* if he had paid the whole purchase in paper, and kept back his specie claim, as the counsel for the appellants suggests, of the value of 1430*l*. in paper? He knew the moment he paid the paper money, *Chapline* might have tendered it to him shilling for shilling, and that it was in fact no more value to him than paper money, and he might as well discount it in the first instance, as to receive it upon a tender; and so *Beatty* expressly swears he understood the contract.

The chancellor I think has erred; but he has erred in not allowing all the payments according to their *nominal* value, and if *Chapline* had not appealed, *Scott* certainly would have done so.

I ask, what evidence is there that the contract was not for paper money? The circumstances of the country, the time when the contract was made, and the testimony of *Charles Beatty*, all combine to prove the contract was for paper money, the then current money of the country, and that no other money was in contemplation. *Chapline* received 206*l*. 12*s*. 6*d*. on the same day in paper money, and passed a receipt for *so much*. If he had sold for *specie*, why did he not reduce it and give a receipt for the value only? *Chapline* indeed says in his answer, that he sold for specie; but his answer is contradicted by the evidence of *Beatty*—it is positively denied by *Scott*, and all the circumstances militate against it.

The counsel for the appellants endeavoured to draw an argument from the price. Let us examine the testimony on that subject.

*Ringer* and *Slusser* both bought of *Chapline* part of the same tract in 1777, at 40s paper money per acre, and *Ringer* swears that *Chapline* wanted him to *take all* the land at the same price—at that time therefore he had not sold to *Scott*; and what *Chapline* states about his having sold to *Scott* in 1776, is therefore contradicted by this testimony. *Scott* never took possession until 1780, and all the neighbourhood prove they never heard of any sale to *Scott* until 1779. The land which *Chapline* sold in the harvest of 1777 to *Ringer* and *Henry Slusser*, at 40s, when depreciation was 4 for 1, he sold part of the same land to *Peter John*, equal in value to *Scott's* at 15s. He sold to *Peter Slusser* at 20s specie, but several witnesses prove his part was worth twice as much as *Scott's*.

In 1779, *David Bryan* thinks, the land was worth 16s. 8d. *William Boon* values it at 17s. 6d. and *Nicholas Sheffer* at 20s. per acre.

If we consider that great part of the purchase went to extinguish an old debt; that this was the refuse of a large tract of land after all which was valuable had been purchased by others; that there is no water on it, nor near it; there can be no doubt that considering the contract for paper money, as *Beatty* declares it, *Scott* has paid the full value of it. One of the exhibits (No. 11) proves that *William Chapline*, one of the appellants, *acknowledged before two witnesses the land had been paid for, and ought to be conveyed.* I contend therefore, that none of the payments ought to have been liquidated. But the chancellor, on maturer reflection, thought that considering it as a contract in the then current money, that the contract ought to be discharged according to the value of the money at the time of *making* the contract. The counsel for the appellants thinks this extraordinary. Suppose the whole sum had been paid down, would it not have been good, and would not *Chapline* have accepted it? There can be no doubt of it. But he asks, why not reduce the value of the 206*l*. 12*s*. 6*d*. which was paid, as well as that which was afterwards paid? I answer, because the contract was for paper money, and what was then paid, was paying the full value of the contract. *Chapline* might consent to take paper money at 6 for 1 in part payment, and set off an old debt for the residue, when he would not accept paper money a year afterwards at 20 for 1. So much therefore as was paid down, was exactly fulfilling the bargain; and if *Scott* had been the cause of delay in the further payments, he ought to make good the depreciation from *that time*, but not make good the depreciation that had taken place before *that time*. Here is one er-

for in reducing the money. But I contend, *Scott* was always ready to pay, and the delay being occasioned by *Chapline*, *Scott* ought not to make good the loss.

There appears to have been a settled design in *Chapline* to bring this matter to a dispute from the first moment after he had got paid. He had the land run by one *Jacob*, and made it upwards of 300 acres. *Beatty* says there is an entry in *Jacob's* field book, which shows this survey was made to bring on a dispute. Whenever *Scott* pressed him, he would not attend. He offered to arbitrate, yet when *Scott* agreed, he flew off. He evaded the execution of the deed, and with a view to enhance the value of the land, and dispute about the contract, he voluntarily offered to assist the assessor in making out his accounts, and put this land at 30s. though the assessor never saw it, and had valued *Slusser's* land at 20s. and *Ringer's* at 15s; and it is proved *Slusser's* is worth twice as much as *Scott's*. But *Chapline*, when off his guard, borrowed 40l. red money of *Scott*, and gave *his note for it*, upon which suit was brought and judgment recovered. This he would not have done if the land had not been fully paid for. But as soon as he was paid, and got in debt by borrowing more money, then he began immediately to dispute.

I contend upon the whole, that the contract was for paper money; that there was no delay on *Scott's* part, and consequently the money ought not to be reduced. But if the court shall think *Scott* has delayed, then the payment made on the day of the contract is good, and depreciation from that *time only* ought to be charged on the residue.

THE COURT OF APPEALS, [*Rumsey*, Ch. J. *Mackall* and *Jones* J.] at this term, (November 1797,) decreed, that so much of the decree of the court of chancery as directed the payment of 90l. 15s. 5d. with interest, by the appellee to the appellants, should be *reversed;* and the decree of the court of chancery, in all other matters and things, except the said payment in manner aforesaid, was by the court of appeals *affirmed.*